**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leonard Ray BLANTON (81–5644), Clyde Edward Hood, Jr. (81–5645), James M. Allen (81–5643), Defendants-Appellants.**

**Nos. 81–5643, 81–5644 and 81–5645.**

United States Court of Appeals,
Sixth Circuit.

Argued June 20, 1983.

Decided Sept. 28, 1983.

Certiorari Denied March 19, 1984.
See 104 S.Ct. 1592.

---

Tyree B. Harris (argued), Dodson, Harris, Robinson & Aden, Nashville, Tenn., for Allen.

John S. McLellan, John S. McLellan, III, Alfred Knight (argued), Kingsport, Tenn., Neal P. Rutledge, Washington, D.C., for Blanton.

William R. Willis, Jr., Robert L. DeLaney, Alfred Knight, Nashville, Tenn., John S. McLellan (argued), Kingsport, Tenn., for Hood.

Joe B. Brown, U.S. Atty., Aleta Arthur, John Philip Williams (argued), Asst. U.S. Attys., Nashville, Tenn., for U.S.

Before EDWARDS, Chief Judge, LIVELY, ENGEL, KEITH, KENNEDY, MARTIN, JONES, CONTIE, KRUPANSKY and WELLFORD, Circuit Judges.*

GEORGE CLIFTON EDWARDS, Jr., Chief Judge.

In this case this circuit is required to review en banc the claims of the former Governor of Tennessee and two associates that they have been deprived of a fair jury trial. Their principal claim is that inadequate protective measures were employed by the trial judge in the jury selection

---

* Honorable Gilbert S. Merritt disqualified himself from the en banc hearing of this case.

process to guard them against the prejudicial effect of massive adverse pretrial media publicity.

We believe that we can and should accept much of the able work accomplished by the panel[1] which first heard this case. We shall therefore deal afresh and in detail only with the principal claim stated above upon which the original panel, 700 F.2d 298, agreed with appellants and ordered a new trial.

This claim we now subdivide into three questions and provide our answers:

1) Did the District Judge employ the best procedure possible in his voir dire examination of the prospective jurors in this case?

   Probably not.

2) Did the trial judge abuse the broad discretion vested in him by the rulings of the Supreme Court of the United States in his impaneling of this jury?

   No.

3) Did the voir dire examination of jurors suffice to produce an impartial jury and fundamentally fair trial?

   Yes.

We accept the original panel's statement of facts:

"The three defendants are Blanton, who served as governor of Tennessee from January, 1975 to January, 1979, James M. Allen, who was a special consultant to the governor for the first six months of the Blanton administration and had served as Blanton's campaign manager, and Clyde Edward Hood, who was a special assistant to the governor from January, 1975 to November, 1977. Defendants were charged on October 29, 1980, in a twelve-count indictment with eight counts of mail fraud (18 U.S.C. §§ 2, 1341 (1976)), one count of violating the Hobbs Act (18 U.S.C. §§ 2, 1951 (1976)), and one count of conspiracy (18 U.S.C. § 371 (1976)). Blanton alone was charged with two counts of tax evasion and filing a false tax return. (26 U.S.C. §§ 7201,

7206(1) (1976)). On March 12, 1981, a superseding indictment was issued adding one mail fraud count. The tax counts against Blanton were severed. The essence of the charges was that defendants used their positions to see that friends of Blanton would receive retail liquor licenses from the Tennessee Alcoholic Beverage Commission (ABC) and that one person paid Blanton for receipt of his license.

"The most important evidence against defendants was the videotaped deposition of Jack Ham. Ham was an immunized witness who was the recipient of a liquor license during Blanton's tenure and who allegedly agreed to give Blanton a cut of the profits in violation of state law. Ham had contributed $1,000 to the Blanton campaign.

"Blanton's role in the scheme allegedly was that he directed that liquor licenses be awarded to political friends or persons like Ham who offered a cut of the profits. He allegedly accomplished this by appointing two of the three commissioners of the ABC, including the chairman, S.J. King, and the commission was therefore able to appoint Blanton allies as director and assistant director of the ABC. Blanton allegedly agreed to an illegal twenty percent cut of the profits of Ham's liquor store, with the payment coming in the form of Ham's purchase of allegedly worthless oil stock from Blanton for $23,000.[1] (This method of payment resulted in tax savings to Ham.) Blanton also allegedly approved a transfer of Ham's liquor license to a more lucrative location.

"Allen was alleged to have been in charge of determining the awarding of liquor licenses even though he had no position at the ABC. He allegedly helped set up an illegal ownership of a liquor store involving the ABC chairman and he attempted to acquire a concealed interest in a liquor store under the guise of a lucrative consulting contract (only one payment was made under the contract). He allegedly was respon-

---

1. The original panel consisted of Circuit Judges Albert J. Engel and Damon J. Keith of this Court, and Chief Judge Emeritus Floyd Gibson

(now Senior Judge of the Eighth Circuit) who wrote the panel opinion.

sible for hiring a new ABC assistant director to help control the ABC even though Allen was not even a state employee at the time, and he instructed the assistant director to recommend the transfer of Ham's license to a better location and recommended against the transfer of other persons' licenses to that area.

"Hood allegedly planned to acquire an interest in two liquor stores in contravention of various state laws and he received a share of the profits of some of the newly licensed liquor stores. He allegedly told the director of the ABC who Blanton's friends were so that the director would recommend to the ABC that those persons receive licenses. He allegedly helped accomplish the transfer of Ham's license by talking to ABC chairman King and by suggesting a particular person as the assistant director who would persuade the other Blanton appointee on the commission. Finally, he allegedly suggested that Ham pay Blanton's share of the profits by buying the worthless oil stock (although he later advised against the purchase).

"The scheme violated Tennessee's laws against an ABC commissioner having an interest in a liquor store,[2] public officials having an interest in a liquor store,[3] undisclosed interest in liquor stores,[4] and bribing of public officials.[5] The federal charge was that the acts (1) constituted a conspiracy to defraud the United States by use of the mails in furtherance of defendants' scheme to violate Tennessee law (18 U.S.C. § 371), (2) when coupled with mailings, constituted mail fraud by defrauding the citizens of Tennessee of the honest services of their government officials (18 U.S.C. §§ 2, 1341), and (3) violated the Hobbs Act (interference with commerce by threats or violence) (18 U.S.C. §§ 2, 1951).

"The testimony of the chief prosecution witness, Jack Ham, was videotaped pursuant to Fed.R.Crim.P. 15(a) because of Ham's poor health. The videotape was edited and played for the jury at the trial. The government obtained Ham's testimony offering him immunity from federal prosecution and civil tax liability, and the state agreed not to prosecute Ham. The ABC agreed that it would not revoke Ham's lucrative liquor license on the basis of truthful statements he made in judicial proceedings.

"The trial was preceded by massive publicity about the case in Nashville, Tennessee, and throughout the state, as one would expect in the trial of a former governor. The record contains over 240 articles from Nashville newspapers adverse to defendants. There are approximately 160 articles which appeared in the six months preceding the trial about the instant prosecution, the prosecution of Blanton's brother, and the prosecution of former Blanton aides.[6] There are more than seventy-five other articles which appeared while Blanton was governor concerning his administration.[7] There are another twenty-two articles on the deposition of Jack Ham, the last of which appeared four months before the beginning of the trial.[8] A large part of the original indictment was published verbatim in the Nashville newspapers. There was also an offer of proof concerning the testimony of news directors of three Nashville television stations about the pretrial publicity. There can be no doubt that there was an extraordinary amount of pretrial publicity concerning this case and other cases involving officials of the Blanton administration and some of Blanton's relatives.

"Jury selection began on April 20, 1981. Testimony in the case began on April 22, 1981, and was concluded on May 29, 1981. Closing arguments and jury instructions were completed on June 2, 1981. The court dismissed three mail fraud counts and the Hobbs Act count as to Allen. The jury deliberated until June 9, 1981, and found Blanton guilty on all eleven counts. It found Allen guilty on all the counts the court had not dismissed (six mail fraud counts and one conspiracy count). It found Hood guilty on six mail fraud counts and the conspiracy count, but it found him not guilty on the other three mail fraud counts and the Hobbs Act count. Blanton was sentenced to three years and fined $11,000. Allen was sentenced to two years and fined

$14,000. Hood was sentenced to eighteen months and fined $14,000."

[1] A total of $38,000 was allegedly paid for the oil stock. In addition to the $23,000 for Blanton's cut of the liquor store profits, Ham and his nephew, Bert Ham, paid another $15,000 as a finder's fee for Blanton's help in getting a loan on a housing project they were building.

[2] Tenn.Code Ann. § 57–1–108(a) (1980) provides: "[N]o person shall be employed in any capacity by the commission, if such person shall have any interest ... in any ... retail dealer licensed as such in the state of Tennessee."

[3] Tenn.Code Ann. § 57–3–210(b)(1) (1980) provides:

No wholesaler's or retailer's license shall be issued to a person who is a holder of a public office .... It shall be unlawful for any such person to have any interest in such wholesale or retail business, directly or indirectly, either proprietary or by means of any loan, mortgage, or lien, or to participate in the profits of any such business[.]

[4] Tenn.Code Ann. § 57–3–210(f) (1980) provides: "It shall be unlawful for any person to have ownership in, or participate, either directly or indirectly, in the profits of any wholesale or retail business licensed under this chapter, unless his interest in said business and the nature, extent and character thereof shall appear on the application ...."

[5] Tenn.Code Ann. § 39–801 (1975) provides:

Any person who corruptly offers, promises, or gives to any executive ... officer ... any gifts, gratuity, or thing of value, with intent to influence his act, vote, opinion, decision, or judgment, on any matter, cause, or proceeding which may be then pending, or which may be by law brought before him in his official capacity, shall, on conviction, be imprisoned in the penitentiary ....

Tenn.Code Ann. § 39–802 (1975) provides:

Any executive ... officer who corruptly accepts, or agrees to accept, any gift or gratuity, or thing of value ... under an agreement or with an understanding that his vote, opinion, or judgment is to be given in any particular manner, or upon any particular side of any question or proceeding which is, or may by law be brought, before him in his official capacity, or that, in such capacity, he is to make any particular appointment, shall, on conviction, be punished by imprisonment in the penitentiary ....

[6] Most of the very negative publicity came shortly after the indictment: "Blanton Faces 12 Counts." Oct. 30, 1980; "Enlist Blanton's Aid in Obtaining Licenses for Future Profits," Oct. 30, 1980; "Allen's Influence Had Wide Impact," Oct. 30, 1980; "Hood's Success, Woes Laid To Misdirected Talent," Oct. 30, 1980; "Blanton-Era Investigations Span 5 years," Oct. 30, 1980; "Blanton Faces Two

Federal Court Trials," Nov. 21, 1980. Not all of the articles were negative: "Blanton's Defense Said Good," Nov. 6, 1980; "Friends Eye Legal Fund for Blanton," Nov. 1, 1980. Two months before trial there were articles on the criminal activities of Blanton aides: "Former ABC Head Enters Guilty Plea," Feb. 23, 1981; "Ex-Blanton Aide Enters Guilty Plea," Feb. 25, 1981; "ABC Probing Blanton Associate's License After Kickback Admission," Feb. 26, 1981. The month before the trial began the superseding indictment was issued, prompting more publicity: "Blanton, 2 Aides Indicted Again," Mar. 12, 1981. As late as four days before trial articles linked Blanton to improper pardons of state inmates: "Tapes Link Blanton to 30 Commutations," Apr. 16, 1981; "Taylor on Tape Links Ray Blanton To Clemency Deals," Apr. 15, 1981. Blanton's brother Gene was also in the news shortly before trial because of alleged improprieties: "Gene Blanton To Be Accused of Not Telling $72,000 Income," Mar. 24, 1981; "Gene Blanton Bought Autos With Business Funds, Says Frensley," Apr. 16, 1981. Most of the other articles dealt with procedural aspects of pretrial proceedings.

[7] Most of these articles dealt with patronage in the Blanton administration and the pardon of prisoners, including the pardon of commuting of sentences of 52 prisoners, 23 of them murderers.

[8] Some of the articles were entitled: "Ham Details Meetings With Blanton," Dec. 6, 1980; "Ham States Hood was 'Silent Partner,'" Dec. 7, 1980; "Ham Threatens TV Cameramen Outside Courthouse," Dec. 10, 1980; "Ham Admits Riches, Refutes Testimony On Pay to Blanton," Dec. 18, 1980.

QUESTION 1.

Did the trial judge employ the best procedure possible in his voir dire examination of the prospective jurors in this case?

Probably not.

The only way this question can fairly be answered is to read the entire content of the juror voir dire, which fills 289 pages of this trial record. We believe that every judge on the en banc court has performed this task—although obviously differences of interpretation remain. We cannot reprint the entire voir dire, but we can reprint the panel's statement of facts concerning it:

The trial court conducted the voir dire *en masse.* It seated a group of veniremen in the jury box and directed questions at that group, but instructed the rest of the veniremen in the courtroom to listen to and pay attention to the questions as the questions would apply equally

to all those selected. During the course of the voir dire the trial court pointed out that the case had been the subject of considerable media attention. It commented that it was sure that all the veniremen had heard about the case, and that some of them may have formed a tentative opinion concerning the probable guilt or innocence of the defendants: The court then said to the veniremen:

> [T]he test is, will you be able to put from your minds whatever you may have seen and heard, and any opinion which you may have tentatively reached, and then to decide this case solely on the facts as you determine them to be, on the sole basis of the evidence which will be adduced in this trial after application of the appropriate law?

One juror was excused because she indicated she could not be impartial. As new veniremen entered the jury box to replace the ones who were excused for whatever reason, the trial court would ask them essentially the same question on pretrial publicity. It usually said it wanted to "particularly emphasize" the point. Out of ninety-two veniremen examined, a total of thirteen were excused because they indicated they had an opinion or prejudice they could not put aside. Of these thirteen, four linked their prejudice to pretrial publicity. Seven of these thirteen were excused when they said they had an opinion, without the court inquiring into the nature or strength of the opinion or whether it could be put aside. Twenty-nine other veniremen were excused for cause for other reasons and the parties excused twenty-eight others with their peremptory challenges.

If we total the disqualifications which resulted from measures taken by the trial judge to secure an impartial jury, we find that 70 out of a total of 92 veniremen were excused.

Accepting as we do appellants' contentions that they had been the subject of massive publicity—much of it negative—we believe the initial trial judge in this case had a more serious problem than my colleagues in dissent tend to recognize, that he recognized the problem to a greater extent than they credit to him, and that he took some very significant measures to deal with it, to which they fail to give sufficient weight.

Governor Blanton ran for and was elected to the highest office in Tennessee state government. This fact guaranteed that for the term of office to which he was elected, he would be constantly in the limelight and every act and word would be subject to comment. The other two defendants accepted positions in state government in close proximity to its head. Under the First Amendment, neither the defendants nor any court in the United States could (or should) have prevented the public media comment which ensued. One of the trial judge's major problems was how to choose a jury without having all potential jurors repeatedly exposed or reexposed to adverse media opinion before the trial ever started. As we read this record, he decided deliberately to avoid such reexposure and reemphasis.

He did repeatedly ask the following question, addressed specifically to the nine jurors then seated in the jury box and phrased to fit specific circumstances of the lengthy voir dire examination:

> **[T]he test is, will you be able to put from your minds whatever you may have seen and heard, and any opinion which you may have tentatively reached, and then to decide this case solely on the facts as you determine them to be, on the sole basis of the evidence which will be adduced in this trial after application of the appropriate law?**

In varying language he repeated this question 18 additional times. The voir dire record, we believe, indicates that he was sensitive to every suggestion of prejudice which came either from jurors' answers or defense counsel suggestion, and in most instances responded with free use of his power to excuse a juror for cause. He exercised that power 42 times.

The trial judge acted on the assumption that all potential jurors in this case had been subjected to some portion of the massive media coverage concerning the defendants in this case. He apparently assumed that media coverage inevitably would have had some prejudicial impact and that the best he could do would be to persuade the individual members of the venire to disclose any biases derived therefrom along with any associations which might have a prejudicial effect. The critical question in this case is whether this approach, when considered together with the added precautionary measures taken by the judge, was within his judicial discretion and was so exercised as to produce an impartial jury.

The author of this opinion was initially persuaded by Judge Gibson's opinion for the panel that reversible error had been committed by denial of either judicial or defense examination of individual jurors concerning specific instances of possibly prejudicial media influence. The factors which changed that opinion and which account for affirmance by a majority of the en banc court were: 1) careful reading of this record, 2) appreciation of the difficulty of preventing prejudicial error resulting from repetition during jury selection of media comment about defendants or from possible prejudicial statements from members of the venire as they were questioned about such comment, 3) appreciation of the sensitivity of the trial judge to any hint of bias and his free use of his power to excuse members of the venire from jury service in the interest of securing an unbiased jury, 4) the availability of the questionnaires to the defense as an important tool available to the defense for investigation of the venire, 5) the substantial increase in number of peremptory challenges which the trial judge approved and finally, 6) the fact that the trial judge found specifically (and with substantial record support) that the result achieved in this jury selection process was a fair and impartial jury.

A major aspect of appellants' claim of prejudice in the voir dire examination concerned pretrial publicity which pertained to other prosecutions of aids or relatives of Governor Blanton. In particular, some of these charges were to the effect that the Governor's aids were selling pardons to convicted criminals in the last days of the Blanton administration. At one point, the U.S. Attorney joined in a request for additional voir dire presumably related to this specific problem. While the trial judge denied the motions at that time, shortly thereafter, he addressed the prospective jurors as follows:

THE COURT: Ladies and gentlemen, I have talked a lot about pretrial publicity that has occurred in connection with this case, the fact that you probably have read, heard things about the case. I have not discussed with you the possibility that you may have been familiar with some of the publicity that surrounded Mr. Blanton at the end of his term of office as governor. It seems probable if you were in this State and area at this time that you read and saw and heard something about the circumstances.

Do any of you have recollection of any facts or circumstances which would cause you either to be inclined to hold that against Mr. Blanton, or on the other hand, to feel that he had been unfairly dealt with and should have been vindicated? We are going back a fair period of time.

But I ask you carefully to search your memories and your consciences on that point. And I ask you as a follow-up to that, does any of you remember anything concerning the circumstance under which Mr. Blanton left the governor's office which would in any way affect your judgment in this case or render you incapable of being completely fair and impartial concerning him and his part in this case?

While in this statement the trial judge avoided repeating the dramatic headlines which appeared above some of the news stories concerning the pardon sale charges, it seems obvious to us that the members of the venire both understood and responded to his concern. We believe this response is documented in the voir dire examinations recorded in Appendix pp. 1537–1728. All of

these pages merit careful attention of any reviewing authority.

Why, then, have we indicated that his handling of the voir dire may not have been wholly adequate? The answer is that we do not wish to imply disapproval in this Circuit of all requests for individual questioning of jurors out of the presence of the entire venire, whether accomplished in chambers or at the bench. In many trials a limited number of defense questions, preferably submitted through the court with waiver by the questioner of any prejudicial effect of the answer, could be appropriate. We recognize that such a procedure in itself would invite immediate problems and attendant risks as a result of the presence of the media. But we would not rule out the possibility that adequate warnings could be given to jurors not to expose themselves to the news media during the course of the trial and deliberations. This might be accompanied by warnings to the press of possible hazards of mistrial due to some printing or broadcasting of voir dire proceedings at a time preceding the announcement of the jury verdict. In many—indeed, most—cases, such measures could be effective. The trial judge obviously did not think they would be here.

As the dissenting opinion points out, the strategy employed by the trial judge in this case is unique. We do not recommend it for emulation unless under similarly extreme circumstances. These would include at least 1) charges generating great public concern, 2) statewide media saturation both before and during trial, and 3) then only if the voir dire is conducted by a trial judge as experienced in and as sensitive to the competing legitimate interests of the individual defendants and the state as proved to be true in this case.

Every criminal trial is, of course, at least to some degree unique. We do not seek to undertake the impossible task of specifying exactly how this trial judge (or any future one) should have employed his judicial discretion.

QUESTION 2

Did the trial judge abuse the broad discretion vested in him by the rulings of the Supreme Court of the United States in his impaneling of this jury?

■ We answer this question with a definite "No."

The United States Supreme Court has *not* established any per se rule which it requires trial judges to follow in the voir dire of a jury venire. *See Rosales-Lopez v. United States,* 451 U.S. 182, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981); *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1960). These opinions emphasize the necessity of the exercise of trial judge discretion concerning the problems actually confronting him. In only one of these cases, *Irvin v. Dowd, supra,* did the United States Supreme Court reverse a conviction due to an unfair trial resulting from massive media pretrial publicity.

As noted above the trial judge in this case was faced with a problem. There was certain to be extraordinary publicity coverage *of the jury selection process,* with the potential of prejudicial error creeping into the trial itself either in the courtroom or in media coverage. The repeated reading to the entire venire of the most dramatic newspaper headlines (those accusing the Blanton administration of selling pardons for example) could have had an arguably serious prejudicial effect. Even if he had (as suggested above) waited until the very end of the selection process and then put the questions concerning prior media contact to each juror individually, he could not be certain that some juror or jurors would not read or hear about on television the very questioning from which they had been screened and about which they had been admonished. Abuse of judicial discretion simply does not fit this trial judge's handling of this difficult trial. See dialogue below:

**Selected examples of the trial judge's handling of the voir dire**

I have been designated to come down and participate in this trial because all of the federal judges in Tennessee have recused themselves from participating.[2] They asked to be excused from participating in this trial because each of them felt that there might be some reason that either he could not be completely fair and impartial, or that the public, and perhaps the parties themselves, the attorneys or other people, might feel that they could not be completely fair.

The only reason I mention that to you now is to indicate that if judges very freely and frankly remove themselves from the participation in a trial, if in the course of this inquiry any reason occurs to you why perhaps you could not be fair, you should have no reluctance whatever in indicating that fact to the Court.

The questions to be asked may indicate to the Court or to counsel some reason that any one of you might have difficulty in being fair in this case. And perhaps even more importantly, this inquiry may indicate to you yourself some reason why you might have difficulty being fair and impartial. It may be perhaps very likely something you have never thought about yourself. But there may be a suggestion contained in a question that will cause you to say, "Perhaps I would have difficulty being fair." And in fairness and honesty to the parties, indicate that fact to the Court. And of course, you will be excused from any further duties in the matter.

Ladies and gentlemen of the venire, while the questions at this particular stage of the procedure are directed primarily to the 12 persons seated in the jury box, I also ask that each of you listen carefully to all of the questions that are asked so that if at some later stage of the proceeding you are asked to occupy a seat in the jury box, it will not be necessary to repeat all of the questions which will be asked.

In that regard and for that purpose, I ask whether all of you can hear me. The ladies and gentlemen there in the back of the courtroom, are you having any difficulty hearing at all? I take it that the public address system is making it possible for you to follow the proceedings.

Ladies and gentlemen, if you have an affirmative answer to a question, if there is some suggestion made in a question that you know a person or you have a feeling about a given matter, raise your hand and indicate that circumstance to the Court. We will then probably follow up on that question.

And I urge you to be extremely careful in answering any question that may be put to you. Answer only the precise question asked. Do not volunteer anything beyond the scope of the question itself. And again, I ask that you listen carefully to the question and then limit your answer precisely to answering the question, without volunteering any additional information or any additional opinion, anything of that nature.

For instance, if you are asked if you know a given witness and you say, "Yes." And you are asked if the fact that you know that person would make you more apt to believe him or disbelieve him, answer that question simply yes or no. Do not say, "I would never believe him because I know him to be a liar."

Put it in that form. You may consider that a little strong, but prospective jurors have made statements like that. And the remedies that are required after a statement like that is made in the courtroom are strenuous ones. So please don't volunteer any additional information, and particularly, express any opinions that you have not been asked to express.

Obviously, ladies and gentlemen, it would be difficult for you to be fair and

---

**2.** Actually all of the U.S. District Judges *in the Middle District of Tennessee* had disqualified themselves. After completion of the selection of the jury, the first trial judge in this case was forced to recuse himself due to the tragic sudden illness and subsequent death of his wife. He was replaced by a U.S. Circuit Judge from the Western District of Tennessee who completed the trial.

impartial if you knew any of the parties well. And I therefore introduce them to you in the order that they are named in the indictment.

At this point the trial judge identified the defendants and those associated with the prosecution and the defense as counsel.

In the same general context, ladies and gentlemen, I recognize that partially because of the fact that these defendants held such offices, this entire matter has been the subject of attention of the news media. I am sure that all of you have at some time read something about this case in the newspapers, have heard something concerning it on the radio at some time, or have even seen or heard reference to it on television at some time.

Similarly, it is entirely likely that some of you may have formed some tentative opinion concerning the probable guilt or innocence of some of the persons involved, including these defendants. However, the test to be applied in determining your qualifications to sit as jurors is not whether you have heard something about the case from the news media or whether you have formed any kind of a tentative opinion based on such reports. Rather—and I put this in the form of a question—the test is, will you be able to put from your minds whatever you may have seen and heard, and any opinion which you may have tentatively reached, and then to decide this case solely on the facts as you determine them to be, on the sole basis of the evidence which will be adduced in this trial after application of the appropriate law?

I take it from your silence that none of you feel that he or she has been prejudiced by what you may have heard or seen.

Yes, ma'am?

JUROR NO. 1 (SHEILA GIBSON): I have been sitting here listening to you. And I am not sure that I would be impartial. I do have somewhat of an idea, from the things I have read and heard.

THE COURT: Thank you very much. You may be excused.

QUESTION 3

Did the voir dire examination of jurors suffice to produce an impartial jury and a fundamentally fair trial?

■ The answer to this question is "Yes."

The trial judge elected to deal with the problem by 1) extensive questioning concerning prior media impact and juror associations, coupled with many dismissals based on even hints of possible prejudice, 2) very substantial increases in the number of peremptory challenges available to each defendant (30 in all), and 3) reliance on defendants' use of detailed questionnaires concerning all potential jurors coupled with sensitive responses by the court to any of defendants' challenges arising from such use.

What follows are selected illustrations or results of each of these techniques as the trial judge employed them:

1) Media impact and juror associations.

What follows are excerpts from the 289 page voir dire examination of jurors:

"[THE COURT:] Is there anything in that fact, the fact that you are a state employee, that would make this a difficult case for you to participate in?

"[POTENTIAL JUROR:] MS. YATES: No, not that I know of, because nothing has been discussed since I have been in the Mental Health Department over at Central State. It has never been mentioned between the two of us in the office.

"THE COURT: Do you hold a civil service position?

"MS. YATES: No.

"THE COURT: I am not familiar enough with Tennessee structure to perhaps intelligently approach this. But are you a provisional employee, or what is your status?

"MS. YATES: I am the clerk ordering in the Maintenance Department. I order all the supplies.

"THE COURT: But you have no assured tenure in that position?

"MS. YATES: (Shakes head.)

"THE COURT: And you are, to put it most bluntly, you would be subject to discharge without cause; it that correct?

"MS. YATES: No, I am pretty well situated.

"THE COURT: But in any event, you do not hold your position on the basis of any kind of civil service or any protection?

"MS. YATES: No, sir, I am not.

"THE COURT: So it is at least conceivable that if there are any political ramifications that might be attributed to your vote in this case, you might suffer some consequences, at least theoretically?

"MS. YATES: I don't know about that.

"THE COURT: Well, I doubt very seriously if any of these things would happen, Ms. Yates. But discretion is the better part of valor. And you will be excused.

"What is your name, sir?

"JUROR NO. 10 (LARRY G. WILLIAMS): Williams.

"THE COURT: Have you heard all the questions that have been asked here this morning and afternoon?

"MR. WILLIAMS: Yes, sir.

"THE COURT: Has anything that's been asked or said indicate to you any reason why you should not sit as a juror here?

"MR. WILLIAMS: Yes, sir. You mentioned the media. And the newspaper. That.

"THE COURT: You mean you have read them, and you have formed a conclusion?

"MR. WILLIAMS: Yes, sir.

"THE COURT: Very well, we appreciate your frankness. You may be excused. (Tr. 145–46)

   *    *    *    *    *    *

"[THE COURT:] I'll ask all of you, has anything that has been said, or any question that's been asked, suggested to any one of you any reason why there might be a problem concerning your participation as a fair and impartial juror? Yes, sir?

"ALTERNATE NO. 4 (WOODROW LESTER) Due to the nature of the trial—I'm a trustee at Temple Baptist Church in Murfreesboro. And my wife is a bookkeeper there. And I'm—due to the nature of the trial, I may not be able to make a just judgment concerning my—concerning the nature of the trial. And it may cause undue ridicule or embarrassment as far as the church work goes.

"THE COURT: I really don't particularly understand why.

"MR. LESTER: Well, if—They may give me a, you know—may give me a hard time about it if some—if Mr. Blanton and the others were acquitted.

"THE COURT: Is this essentially a religious organization by which you are employed?

"MR. LESTER: Yes, sir. Temple Baptist Church.

"THE COURT: Are you suggesting that there is a religious organization that is not willing to have its employees participate fully in civic affairs?

"MR. LESTER: I'm sure they wouldn't mind me participating in it in as far as the trial and jury goes. But I don't know about this particular case.

"THE COURT: You mean solely on the basis of the duration of it?

"MR. LESTER: No, sir. On the subject matter. Concerning the alcoholic beverages. It's in our church covenant that we don't—

"THE COURT: I misunderstood what you were saying, Mr. Lester. You may be excused. Thank you for your frankness. (Tr. 251–52)

   *    *    *    *    *    *

"THE COURT: Mr. Bell, would your answer to any question that has been asked here today be any different than the answers of the other five persons seated tentatively as alternate jurors here this morning?

"MR. BELL: Yes, it would.

"THE COURT: There would be a difference?

"MR. BELL: Yes, sir.

"THE COURT: What is the difference, sir?

"MR. BELL: I have already formed my opinion?

"THE COURT: You do have an opinion concerning the ultimate issues in the case?

"MR. BELL: Yes, sir.

"THE COURT: Thank you, Mr. Bell. You may be excused.

"Good morning, Mr. Pigg. I'll amend that. Good afternoon.

"Have you been able to hear everything that's happened here today?

"ALTERNATE NO. 2 (JOE H. PIGG) Yes, I have, Your Honor.

"THE COURT: Has anything that's been said or questions that have been asked indicated to you any reason why you could not serve as a fair juror in this case?

"MR. PIGG: Your Honor, I would like to be excused for the reason I've already formed an opinion.

"THE COURT: You may be excused.

"I'm having a little trouble, reading your name.

"ALTERNATE NO. 2 (MARGARET L. KEMNETZ) Kemnetz.

"THE COURT: Kemnetz, thank you. Is the third letter an "M"?

"MS. KEMNETZ: Yes.

"THE COURT: All right. Ms. Kemnetz, while you were seated in the back of the jury room (sic.), were you able to hear all the statements and questions of the Court?

"MS. KEMNETZ: Yes, sir.

"THE COURT: Did anything that's been said or asked suggest to you any reason why you could not be a fair juror in this case?

"MS. KEMNETZ: Yes, sir. I'm acquainted with Bernie Weinstein. And I already have formed an opinion.

"THE COURT: Will the reporter repeat that answer to the Court?

"MS. KEMNETZ: I'm acquainted—

"THE COURT: No, I don't want you to—

"THE REPORTER: 'I'm acquainted with Bernie Weinstein. And I already have formed an opinion.'

"THE COURT: All right. Thank you very much. You may be excused. (Tr. 279–81)

\*     \*     \*     \*     \*     \*

"THE COURT: In addressing myself to the newly seated alternates, again we ask whether you have been able to hear everything that's been said here this morning. Have you heard all the statements of the Court and all the questions that have been asked?

"On the basis of what you have heard, do you now feel—do you know of any reason why you perhaps could not be a fair and impartial juror in this case?

"Mr. Hibbett?

"ALTERNATE NO. 1 (EUGENE HIBBETT) Yes, sir. I don't think I would be a good candidate for either side. I know many—

"THE COURT: Don't express any opinions. Do you know persons who are involved in the case?

"MR. HIBBETT: Yes.

"THE COURT: You indicated for either side.

"MR. HIBBETT: That's right.

"THE COURT: But in any event, your own personal feeling, Mr. Hibbett, is that you—it would be difficult for you to be fair and impartial if you were asked to serve, on the basis of your knowledge of some of the people involved?

"MR. HIBBETT: Yes.

"THE COURT: Thank you very much, sir. You may be excused.

"THE COURT: Ms. Meehan?

"ALTERNATE NO. 1 (NANCY L. MEEHAN) Yes, sir.

"THE COURT: Have you heard everything that's been said?

"MS. MEEHAN: Yes, I have.

"THE COURT: Is there anything that suggested to you any reason you could not be a fair and impartial juror in this case?

"MS. MEEHAN: Two reasons. One, I'm waiting approval on my application to the police department. Two, I've already formed an opinion.

"THE COURT: What was the second one?

"MS. MEEHAN: I've already formed an opinion on the outcome.

"THE COURT: Very well. Thank you, Ms. Meehan. You may be excused.

"THE COURT: Good morning, Mr. Hicks. Have you heard everything that's happened here this morning?

"ALTERNATE NO. 1 (WILLIAM M. HICKS) Yes, sir.

"THE COURT: Has any of it suggested any reason why you couldn't serve fairly and impartially in this case?

"MR. HICKS: I'm a long-time friend of one of the witnesses, Mayor Richard Fulton. He and I were raised up practically together.

"THE COURT: You grew up with Mr. Fulton?

"MR. HICKS: Yes, sir.

"THE COURT: Do you have a continuing contact with him?

"MR. HICKS: Yes. We went all the way through school together. Known him since childhood.

"THE COURT: Do you think the fact that you know him and continue to be a close friend of his, would that make it difficult for you to participate in this case?

"MR. HICKS: I'm afraid, Your Honor, it would.

"THE COURT: Very well. You may be excused.

"Mr. Alexander, have you heard everything that's happened today?

"ALTERNATE NO. 1 (JAMES H. ALEXANDER) Yes, sir.

"THE COURT: Have any of the statements of the Court or questions indicated to you any reason why if you were seated as an alternate, and then were required to serve as a member of the Jury itself, that you could not be fair?

"MR. ALEXANDER: Well, yes, sir, Your Honor.

"THE COURT: I don't understand. You mean, yes, there is a reason? Or you—

"MR. ALEXANDER: Yes, sir.

"THE COURT: What is that reason?

"MR. ALEXANDER: Well—

"THE COURT: Don't state an opinion, sir. Do you know somebody, or—

"MR. ALEXANDER: I'm acquainted with Bob Frensley.

"THE COURT: And because of that acquaintanceship or friendship, whatever it is,—

"MR. ALEXANDER: Friendship.

"THE COURT: —you feel it would be embarrassing or difficult for you to participate in this case? It that what you're saying to the Court?

"MR. ALEXANDER: Well, not necessarily embarrassing. But I have respect for him. And I take his word on anything he says.

"THE COURT: So that you would be inclined to give greater weight to his testimony than perhaps to some other person who testifies whom you do not know?

"MR. ALEXANDER: Yes, sir.

"THE COURT: Thank you, Mr. Alexander. You may be excused.

"Good morning, Mr. Miller. Have you been able to hear all the questions and statements?

"ALTERNATE NO. 1 (WALTER KENNETH MILLER) Yes.

"THE COURT: Has anything suggested to you any reason that you would have trouble being fair if selected as a juror?

"MR. MILLER: Due to the extent of the coverage of the press, I have already formed an opinion. I feel like I would be an affected witness.

"THE COURT: Very well, you may be excused. (Tr. 263–67)"

Judge Engel's dissent criticizes the voir dire as consisting of "a single question eliciting only a juror assurance (through silence) of impartiality." [dissent at p. 834] As can be seen from excerpts of the transcript, however, the voir dire was much more extensive than indicated by the dissent. We believe that the trial judge did succeed in securing the cooperation of the jurors in disclosing possible bias. We also believe that he reacted quickly and effectively to protect defendants from any such bias.

2) Peremptory Challenges

Under the applicable rule, Federal Rules of Criminal Procedure 24(b), the government was entitled to six peremptory challenges and the three defendants were entitled to ten. The defendants sought an additional twenty challenges, ten for each defendant, and the government objected. The trial judge granted defendants' request. Only one of the defendants used all peremptory challenges.

While we recognize that appellants contend in this case that their use of peremptory challenges was hampered by their inability to explore each juror's contact with media expressions prior to trial, we also are profoundly aware that the most searching cross-examination personally conducted by a lawyer for a defendant might not suffice to bring into the trial record a secretly held bias on the part of a juror against a particular defendant. It is, of course, in part for that reason that twelve jurors are chosen and the verdict of guilt must be unanimous. The trial judge's grant of so many additional peremptory challenges, coupled with the information supplied as to each prospective juror in the official questionnaire, contributes substantially to our conclusion that in sum total the jury voir dire as conducted was within the discretion of the trial judge.

3) The Questionnaires

As indicated above, each juror in the entire venire was asked to and did furnish answers to the official questionnaire, which is produced on the following page.

## THE LAW OF THIS CASE

The fundamental standard of review of a trial judge's conduct of a voir dire examination is set forth in the most dramatic case where the Supreme Court has dealt with the central question of this case.

In *Irvin v. Dowd,* 366 U.S. 717, 722–24, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1960), the Supreme Court, with Justice Tom Clark writing for the Court, said as follows:

In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *In re Oliver,* 333 U.S. 257 [68 S.Ct. 499, 92

L.Ed. 682]; *Tumey v. Ohio*, 273 U.S. 510 [47 S.Ct. 437, 71 L.Ed. 749]. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133, 136 [75 S.Ct. 623, 625, 99 L.Ed. 942]. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as "indifferent as he stands unsworne." Co.Litt. 155b. His verdict must be based upon the evidence developed at the trial. Cf. *Thompson v. City of Louisville*, 362 U.S. 199 [80 S.Ct. 624, 4 L.Ed.2d 654]. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807).[3] "The theory of the law is that a juror who has formed an opinion cannot be impartial." *Reynolds v. United States*, 98 U.S. 145, 155 [25 L.Ed. 244].

It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Spies v. Illinois*, 123 U.S. 131, 8 S.Ct. 21, 31 L.Ed. 80; *Holt v. United States*, 218 U.S. 245, 31 S.Ct. 2, 54 L.Ed. 1021; *Reynolds v. United States, supra.*

The adoption of such a rule, however, "cannot foreclose inquiry as to whether, in a given case, the application of that rule works a deprivation of the prisoner's life or liberty without due process of law." *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166. As stated in *Reynolds*, the test is "whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality. The question thus presented is one of mixed law and fact . . . ." At p. 156. "The affirmative of the issue is upon the challenger. Unless he shows the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality, the juror need not necessarily be set aside . . . . If a positive and decided opinion had been formed, he would have been incompetent even though it had not been expressed." At p. 157. As was stated in *Brown v. Allen*, 344 U.S. 443, 507, 73 S.Ct. 397, 446, 97 L.Ed. 469, the "so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge." It was, therefore, the duty of the Court of Appeals to independently evaluate the *voir dire* testimony of the impaneled jurors.

The rule was established in *Reynolds* that "[t]he finding of the trial court upon that issue [the force of a prospective juror's opinion] ought not be set aside by a reviewing court, unless the error is manifest." 98 U.S., at 156.

We find no "manifest" error in the trial judge's ruling on the impartiality of this jury. Indeed the contrast between *Irvin v. Dowd, supra* and our instant case is very great. In the *Irvin* case, Justice Clark pointed out:

Here the "pattern of deep and bitter prejudice" shown to be present throughout the community, cf. *Stroble v. California*, 343 U.S. 181 [72 S.Ct. 599, 96 L.Ed.

---

**3.** "[L]ight impressions which may fairly be supposed to yield to the testimony that may be offered; which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions, which will close the mind against the testimony that may be offered in opposition to them; which will combat that testimony and resist its force, do constitute a sufficient objection to him."

872], was clearly reflected in the sum total of the *voir dire* examination of a majority of the jurors finally placed in the jury box. Eight out of the 12 thought petitioner was guilty. With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations.

In our present case *no* juror who helped determine the case expressed a pretrial conviction of appellants' guilt.

Infinitely closer to our present case are the facts and law in a case written for the U.S. Supreme Court by Justice Clark—the same Justice who wrote the *Irvin v. Dowd* opinion.

In *Beck v. Washington,* 369 U.S. 541, 555–58, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), Justice Clark said:

> As in his grand jury attack, petitioner makes no claim that any particular petit juror was biased. Instead, he states the publicity which prevented the selection of a fair grand jury also precluded a fair petit jury. He argues that such a strong case of adverse publicity has been proved that any jury selected in Seattle at the time he was tried must be held to be presumptively biased and that the trial court's adverse rulings on his motions for a change of venue and for continuances were therefore in error. Of course there could be no constitutional infirmity in these rulings if petitioner actually received a trial by an impartial jury. Hence, our inquiry is addressed to that subject.

> Petitioner's trial began early in December. This was nine and one-half months after he was first called before the Senate Committee and almost five months after his indictment. Although there was some adverse publicity during the latter period which stemmed from the second tax indictment and later Senate hearings as well as from the trial of petitioner's son, it was neither intensive nor extensive. The news value of the original "disclosures" was diminished, and the items were often relegated to the inner pages.

> Even the occasional front-page items were straight news stories rather than invidious articles which would tend to arouse ill will and vindictiveness. If there was a campaign against him as petitioner infers, it was sidetracked by the appearance of other "labor bosses" on the scene who shared the spotlight.

> The process of selecting a jury began with the exclusion from the panel of all persons summoned as prospective jurors in the November 12 trial of Dave Beck, Jr. In addition, all persons were excused who were in the courtroom at any time during the trial of that case. Next, the members were examined by the court and counsel at length. Of the 52 so examined, only eight admitted bias or a preformed opinion as to petitioner's guilt and six others suggested they might be biased or might have formed an opinion— all of whom were excused. Every juror challenged for cause by petitioner's counsel was excused; in addition petitioner was given six peremptory challenges, all of which were exercised. Although most of the persons thus selected for the trial jury had been exposed to some of the publicity related above, each indicated that he was not biased, that he had formed no opinion as to petitioner's guilt which would require evidence to remove, and that he would enter the trial with an open mind disregarding anything he had read on the case.

> A study of the *voir dire* indicates clearly that each juror's qualifications as to impartiality far exceeded the minimum standards this Court established in its earlier cases as well as in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), on which petitioner depends. There we stated:

> "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion

and render a verdict based on the evidence presented in court." *Id.,* at 723, 81 S.Ct. at 1642.

We cannot say the pretrial publicity was so intensive and extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors and would be compelled to find bias or preformed opinion as a matter of law. Compare *Irvin v. Dowd, supra,* at 723–728, 81 S.Ct. at 1642–46, where sensational publicity adverse to the accused permeated the small town in which he was tried, the *voir dire* examination indicated that 90% of 370 prospective jurors and two-thirds of those seated on the jury had an opinion as to guilt, and the accused unsuccessfully challenged for cause several persons accepted on the jury. The fact that petitioner did not challenge for cause any of the jurors so selected is strong evidence that he was convinced the jurors were not biased and had not formed any opinions as to his guilt. In addition, we note that while the Washington Supreme Court was divided on the question of the right of an accused to an impartial grand jury, the denial of the petitioner's motions based on the bias and prejudice of the petit jury did not raise a single dissenting voice.

"While this Court stands ready to correct violations of constitutional rights, it also holds, that 'it is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality.'" *United States ex rel. Darcy v. Handy,* 351 U.S. 454, 462, 76 S.Ct. 965, 970, 100 L.Ed. 1331 (1956). This burden has not been met.

This circuit has adopted the above *Irvin v. Dowd* standard in the following language:

"The constitutional standard of fairness requires that a defendant have 'a panel of impartial, "indifferent jurors."'" *Irvin v. Dowd,* 366 U.S. at 722 [81 S.Ct. at 1642]." *Murphy, supra,* [421 U.S.] at 799, 95 S.Ct. at 2035. It is not necessary that the jurors be totally ignorant of the facts and issues involved. *Irvin, supra,* at 722, 81 S.Ct. at 1642.

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. (citations omitted).

*Id.* at 723, 81 S.Ct. at 1642.
(Citations omitted.)

\* \* \* \* \* \*

During the voir dire, Juror Yell was asked if there was any reason she might be unable to return an unbiased and unprejudiced verdict. She answered "No." At the hearing after the trial, she indicated that the conversation she overheard had no bearing on her decision. Although a juror's assurance of impartiality is not dispositive of petitioner's rights, a trial judge's finding of impartiality should be set aside only upon a showing that prejudice is manifest. *Irvin, supra,* 366 U.S. at 723, 81 S.Ct. at 1642.

*Haney v. Rose,* 642 F.2d 1055, 1059–60 (6th Cir.1981).

Under this legal precedent it is significant that, following the voir dire examination, Judge Peck denied further motions regarding the conduct of the voir dire saying:

> [F]or whatever it is worth, I have the view that the Jury that has been selected is as fair and impartial a Jury as could be obtained. (Tr. at 291)

We now hold, both for the reasons set forth above and for one additional reason set forth below, that the trial judge did not abuse his discretion in the handling of jury selection in this trial.

Defendants have adduced no proof that this was a biased jury.

At the en banc hearing of this case, the author of this opinion asked lead counsel for

Governor Blanton whether there was evidence of jury bias. The response was made wholly in relation to one juror and cited evidence which we deem quite inconclusive. We have searched this record for any other such evidence pertaining to periods before, during, or posttrial and have found none.

For the reasons set forth above, we believe that the jury selection process, although not perfect, was nonetheless both fair and effective in that it resulted in an impartial jury.

We find no merit as to other issues, and in this regard adopt the panel opinion's dispositions for the reasons stated therein. The judgment of the District Court is affirmed.

CORNELIA G. KENNEDY, Circuit Judge.

I write separately only to highlight what I consider to be the significant fact that defense counsel never complained to the District Court about the group nature of the inquiry of the first group of prospective jurors into whether they could lay aside any impressions or opinions that they may have formed and render a verdict based solely on the evidence presented in court. Defense counsel did unsuccessfully assert a right to participate in the voir dire examination. There is no evidence, however, that defense counsel ever requested an individual voir dire by the judge on the question of the jurors' ability to lay aside any impressions or opinions that they may have formed. Moreover, there is every indication on the record that the trial judge would have complied with such a request had it been made. Whenever a prospective juror indicated that she or he had formed some opinion concerning the guilt or innocence of the defendants, the trial judge made further inquiry into that juror's ability to lay aside the opinion. Also, whenever a new juror was called to replace someone who had been excused, the trial judge inquired into her or his ability to render a verdict based solely on the evidence presented in court. At no point did defense counsel request that the original veniremen be *individually* questioned on that issue. Accordingly, defendants should not now be heard to complain that group voir dire examination was insufficient to produce an impartial jury and a fundamentally fair trial.

ENGEL, Circuit Judge, dissenting.

The en banc opinion today establishes a new rule of law governing jury selection in federal trials involving widespread pretrial publicity.

That new rule is that where inflammatory pretrial publicity is pervasive, inquiry into an individual juror's knowledge and predisposition is superfluous. The only necessary inquiry, according to the majority, is whether the juror believes in his own mind that he can lay aside such knowledge and preconceived notions and decide the case only upon the evidence presented. The en banc opinion further imposes upon the defense the burden of proving prejudice although the trial court effectively precluded any meaningful inquiry needed to establish it. These propositions overrule established precedent. I therefore respectfully dissent.

I remain completely satisfied with the careful analysis and scholarship of Judge Gibson in the original panel decision, *United States v. Blanton,* 700 F.2d 298 (6th Cir. 1983).[1] That opinion fully discusses the law and policies concerning the adequacy of *voir dire* in cases of widespread pretrial publicity. These additional comments supplement Judge Gibson's fine opinion, addressing additional concerns and, occasionally, misconceptions which I believe have developed during the course of the en banc proceedings.

1. The published opinion lists Bailey Brown as trial judge. 700 F.2d at 298. The jury selection process under scrutiny, however, took place before another judge of this circuit. Judge Brown took over after jury selection, when the original judge, through circumstances completely beyond his control, was unable to continue. Both were Circuit Judges, and each was successively designated by the Chief Judge of this Circuit to sit as trial judge due to the self-disqualification of all the district judges in the Middle District of Tennessee.

## I.

The en banc opinion is unprecedented in the scope of the limitations it permits upon jury *voir dire* in trials involving widespread, inflammatory publicity. *Not one* question was permitted to be put to the prospective jurors, either individually or as a group, concerning the sources of publicity they had been exposed to or the content of such sources they might have remembered.

Judge Gibson's opinion makes clear that although habeas corpus review of jury selection is judged solely on a constitutional standard, *see United States ex rel. Darcy v. Handy,* 351 U.S. 454, 462, 76 S.Ct. 965, 970, 100 L.Ed. 1331 (1956) (defendant must show bias not as a matter of speculation, but as a demonstrable reality), review of federal prosecutions also rests on the reviewing court's supervisory power. *See Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam); *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). Thus, in federal cases involving "pervasive" pretrial publicity, prejudice is presumed. *Murphy,* 421 U.S. at 798–99, 95 S.Ct. at 2035; *see also, Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *Goins v. McKeen,* 605 F.2d 947, 951 nn. 7 & 8 (6th Cir.1979). Once prejudice is so established, it is the trial judge's duty to assess each potential juror's impartiality—*i.e.,* his ability to lay aside his impression or opinion and render a verdict based on the evidence. *Reynolds v. United States,* 98 U.S. 145, 155, 25 L.Ed. 244 (1878). Finally, it is "the duty of the Court of Appeals to *independently evaluate* the voir dire testimony of the impaneled jurors." *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1642 (emphasis added).

The heart of the issue in this appeal is how much information the *voir dire* must elicit concerning the source and content of a venireman's knowledge of the case in order that the trial court and, on review, the court of appeals may assess jury impartiality effectively. Judge Gibson's opinion relies on the established principle that "[t]he juror's assurances that he is equal to this task [of laying aside preconceptions] cannot

be dispositive of the accused's rights .... " *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). That same principle has guided our circuit in *United States v. Giacalone,* 588 F.2d 1158, 1163 (6th Cir.1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2162, 60 L.Ed.2d 1045 (1979), and *Goins v. McKeen,* 605 F.2d 947, 952–53 (6th Cir.1979).

To my knowledge, no court of appeals has ever before affirmed a conviction in a case of widespread and inflammatory pretrial publicity when the entire *voir dire* concerning publicity consisted of a single question eliciting only a juror assurance (through silence) of impartiality:

> [T]he test is, will you be able to put from your minds whatever you may have seen and heard, and any opinion which you may have tentatively reached, and then to decide this case solely on the facts as you determine them to be, on the sole basis of the evidence which will be adduced in this trial after application of the appropriate law?

App. 1487.

As both the en banc opinion and Judge Gibson's panel opinion make clear, the above question was preceded by frequent admonitions specifically cautioning the jurors to refrain from disclosing any further information bearing on possible bias, either as to source or as to content:

> And I urge you to be *extremely careful* in answering any question that may be put to you. *Answer only the precise question asked. Do not volunteer anything* beyond the scope of the question itself. And again, I ask that you listen carefully to the question and then *limit your answer precisely* to answering the question, *without volunteering any additional information or any additional opinion,* anything of that nature.

(emphasis added). App. 1468–69. Similar precautions were repeated throughout the entire *voir dire. See, e.g.,* 1479–80, 1506–07. In addition the trial judge on several occasions chided (albeit gently) jurors whose answers or comments threatened to

disclose any specific knowledge or opinion. *See, e.g.,* App. 1550, 1578, 1579.

It is singularly curious that the reason the trial judge apparently felt that more specific questioning was unnecessary was that he assumed that the entire venire had been exposed to the pretrial publicity which even the en banc majority admits was "massive." En banc Op. at 818, *ante, quoting* 700 F.2d at 302. From this undeniable fact, the trial judge and the en banc majority were led to the totally erroneous conclusion that it was therefore unnecessary to inquire into the particular knowledge of any individual juror or the source from which that knowledge was derived. This conclusion directly conflicts with our circuit's holding in *Goins v. McKeen,* 605 F.2d at 952–53.

In *Goins v. McKeen,* our court indicated that juror exposure to inflammatory publicity—such as that so plainly spread upon this record—"render[s] the circumstances inherently prejudicial and . . . a violation of petitioner's constitutional right to trial by an impartial jury may be presumed." *Id.* at 954. In contrast, the trial court here assumed that assurances gained from silence were sufficient to overcome that presumption. The en banc opinion thrusts the burden upon the defense to prove prejudice even though it has been presumptively established under the law. *Compare* En banc Op. at 832, *ante, with e.g., Murphy,* 421 U.S. at 798–99, 95 S.Ct. at 2035.

## II.

The en banc decision is completely inconsistent with Judge Celebrezze's opinion in *United States v. Johnson,* 584 F.2d 148 (6th Cir.1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1239, 59 L.Ed.2d 469 (1979). In *Johnson,* we set out the proper *voir dire* procedure concerning pretrial publicity. Although trial judges have broad discretion in conducting *voir dire,* we recognized that "this discretion is limited by the 'essential demands of fairness.'" *Johnson,* 584 F.2d at 155, *citing, Aldridge v. United States,* 283 U.S. 308, 310, 51 S.Ct. 470, 471, 75 L.Ed. 1054 (1931). Fairness requires that the veniremen not

only be questioned about their ability to disregard pretrial publicity but also that they be questioned concerning "the sources and intensity of [their] exposure" to the pretrial publicity. *Johnson,* 584 F.2d at 155.

In *Johnson,* our court also addressed the circumstances in which the use of "content" questions is appropriate. "Content" questions request the prospective juror to "recite everything he remembers about the topic of inquiry." *Id.* at 156 n. 17. In the context of pretrial publicity, a "content" question would be asked to determine what a prospective juror remembered about a specific article. Although "the better practice is for the court to ask content questions of any juror who has been exposed to pretrial publicity which the court knows to be of clear prejudicial potential," *id.* at 156 n. 19, we need not consider the issue of content questioning since defendants *were never given an opportunity to discover the sources of what the prospective jurors had read or seen.* The trial judge thus violated the fundamental rule that veniremen must be questioned concerning "the sources and intensity of [their] exposure" to pretrial publicity. *Id.* at 155. "Content" questions need be asked only where "the nature of juror exposure to . . . prejudicial material is not apparent from responses to . . . more general [*e.g.,* source] questions," *id.* at 156, but questions concerning the sources of exposure are never dispensable.

As the en banc opinion acknowledges, the pretrial publicity was massive. It would in fact be difficult to find a criminal case in which the extent of publicity was so carefully chronicled and the objections to an abbreviated *voir dire* so clearly and fully preserved. The Appendix includes 610 pages of detailed newspaper accounts of the events leading to the trial of these defendants. The en banc opinion is simply not faithful to the record in suggesting that some articles containing favorable material somehow neutralized the adverse publicity. It was devastating. The publicity concerning Governor Blanton and the other defendants in this appeal was not confined to the matters involved in the trial. The articles

covered not only the entire range of the defendants' alleged activity but also implicated the defendants in the alleged criminal activities of other well-known citizens of Tennessee, including other members of Blanton's family. An objective examination of the compiled record of newspaper publicity reveals that it was overwhelmingly accusatory. For example, an article in the Nashville *Tennessean* appearing April 7, 1981 (two weeks before the jury selection commenced) was entitled: "JAKE BLANTON ADMITS TAKING BID–RIG PAYOFF." App. 264. The opening paragraphs of the article state:

> James C. (Jake) Blanton admitted in federal court yesterday he told a meeting of bid riggers here in 1978 he wanted a $41,000 payoff to buy his girlfriend a house.
>
> Blanton, 59, of Tupelo, Miss., also implicated his nephew, Gene Blanton, former Gov. Ray Blanton's brother, in several schemes to rig state highway paving contracts, as Gene looked on impassively.

App. 264. The record reveals in-depth media exploration of charges that Governor Blanton and others were involved in selling pardons during the closing days of his administration. On April 15, 1981, less than one week before the jury selection began, the *Tennessean* in an article headlined "TAYLOR ON TAPE LINKS RAY BLANTON TO CLEMENCY DEALS" described the testimony of Arthur Wayne Baldwin [2] concerning Governor Blanton's involvement in a "clemency-peddling scheme" to sell clemency and commutations to hardened state criminals at amounts said to range from $3,000 to $100,000. App. 427. A follow-up article the next day linked Blanton to 30 commutations, App. 425, while elsewhere in the same edition of the *Tennessean* another article highlighted the ongoing trial of Gene Blanton in Memphis for tax fraud. App. 426. A review of earlier articles included in the record reveals the derogatory nature of the clemency-sale stories, particularly those pertaining to the proposed pardon of an allegedly psychotic double murderer. *See, e.g.,* App. 290–92, 293–94, 299, 302–03. The allegations of "influence-peddling," mail fraud, the extortion involving Governor Blanton and co-defendants Hood and Allen, which formed the basis of the instant litigation, are exhaustively chronicled in articles from the Nashville *Tennessean* and Nashville *Banner* as well as other publications.

As an examination of the massive record reveals, a reader of the *Tennessean* or the *Banner* was faced with a highly complex and inflammatory story of allegedly illicit, unethical and criminal activities which either directly involved the defendants or linked them by name and association to others who were responsible. All of this was bound to lead to a substantial probability that prospective jurors, particularly those who read the two Nashville daily newspapers, would be exposed to news of many crimes and activities beyond those directly involved in the trial. A very real possibility existed that jurors would confuse the activities of Governor Ray Blanton with others in Blanton's family who were also being charged or implicated in a wide variety of illicit conduct.

It was the absence of such a record in *United States v. Johnson, supra,* which led Judge Celebrezze to uphold the relatively limited *voir dire* there:

> In this case, the requests by defense counsel at trial for further questioning of veniremen related to pretrial publicity generally and not to whether jurors recalled any specific matters. The record of the voir dire contains neither newspaper articles nor any description of other publicity relating to the case. In the absence of a clear foundation for inquiring into juror recollection of particular prejudicial matter, the trial judge was justified in refusing to ask content questions. *See [U.S. v.] Robinson, supra,* 154 U.S.App.D.C. at 270, 475 F.2d [376] at

**2.** Baldwin's conviction in Memphis of four counts of a federal indictment charging him with arson and unlawful use of explosives was upheld by a panel of this court in *United States v. Baldwin,* 709 F.2d 1509 (6th Cir.1983).

381. *Cf. Ham v. South Carolina,* 409 U.S. 524, 528 n. 4, 93 S.Ct. 848 [851 n. 4], 35 L.Ed.2d 46 (1974); *United States v. Giacalone,* 574 F.2d 328, 334–35 (6th Cir. 1978).

*Id.* 584 F.2d at 156. Even in *Johnson,* however, inquiry was permitted to determine whether jurors had actually read certain particularly inflammatory articles. The reviewing court therefore observed that "knowledge of juror exposure to them would provide defense counsel with sufficient information to intelligently exercise peremptory challenges, without additional questioning as to what jurors remembered about the reports." *Id.* at 156.

### III.

The jury *voir dire* in this case was altogether inadequate to uncover possible bias in the jurors. The precautions taken by the trial judge were simply not responsive to the dangers posed by the selection technique employed. As noted in section I, *supra,* the technique of *voir dire* examination actually encouraged nondisclosure of juror bias and was inherently intimidating, although clearly not intended to be.

It does not take extensive acquaintance with jury trials to reach the conclusion that most jurors perceive themselves as fair-minded, objective individuals. Indeed, most are. It is also a fair observation that many, if not most jurors prefer to remain as inconspicuous as possible during *voir dire.* This is only natural. Jurors find themselves in a strange environment. Even the best efforts of trial judges and attorneys cannot quite dispel the courtroom atmosphere of forbidding formality which naturally inhibits volunteered speech. The *voir dire* here presents a classic case of such reticence on the part of jurors during questioning concerning their personal acquaintance with parties and anticipated witnesses. On a number of occasions there was no response when questions concerning familiarity with witnesses were put to the venire *en masse* and yet when an attorney had knowledge that a particular juror was familiar with a given witness that juror readily admitted such knowledge. Although some jurors did

not respond sooner because the juror did not connect the name given with the person he or she knew, or didn't hear the question when it was originally asked, the failure to respond more often reflected the completely natural reticence of a juror to say anything at all unless directly questioned. Volunteering answers to questions put only generally to the venire *en masse* comes hard for most jurors.

The majority opinion stresses that the trial judge was particularly generous in allowing additional peremptory challenges. This was indeed a salutary precaution given the nature of the case. However, I respectfully submit that the problem was not so much the number of peremptory challenges allowed (and they were not all used) as it was the absence of any meaningful information which might have enabled the defense counsel to exercise those challenges intelligently.

Likewise the extensive questioning of jurors concerning their acquaintance with parties, or witnesses, or law enforcement personnel, or persons in state government fell far short of curing the need for the most important information of all: what did a juror know about the case coming before him? What accurate or inaccurate preconceived notions did he have concerning it? The en banc opinion appears to conclude that if one but asks enough other questions, the inherent risk in not asking the most relevant questions is somehow dissipated. One need only ask why it seemed important to the trial judge that no juror disclose any specific knowledge or preconceived opinion to understand the prejudice of this method. Why should a juror not volunteer information? Obviously the court feared that in so disclosing, the rest of the venire might somehow be contaminated. I respectfully suggest that if that fear was justified, the answer was not to suppress the information altogether. If the dreaded answer would contaminate the entire venire, why would it not also contaminate the juror who entertained such notions irrespective of whether he or she subjectively believed it would?

## IV.

The trial judge's refusal to allow the defense to discover what the veniremen had read or heard concerning Blanton not only adversely prejudiced the ability of the court and counsel to weigh challenges for cause, it also had a profoundly debilitating effect upon the intelligent use of peremptory challenges. Even counsel for the government joined the defense in requesting a more explicit *voir dire* on publicity. See section V, *infra, quoting* App. 1531–32.

The en banc decision seeks to excuse the trial judge's error by noting that defendants had access to information supplied by each venireman on an official questionnaire, that defendants were given thirty peremptory challenges, and that guilty verdicts must be unanimous.

A glance at the "official questionnaire" reveals that it could provide no information regarding exposure to pretrial publicity other than whether the juror could read, write, and understand English.[3]

As is earlier observed, unlimited peremptory challenges could have been granted, but with no factual basis on which to exercise them intelligently, this additional protection would be futile.

The en banc opinion also indicates that the requirement of a unanimous jury verdict is an antidote for inadequate *voir dire.* However, no single requirement for a fair trial can relieve the court of the responsibility to observe all of the procedures which the cumulative wisdom of the years has found so necessary to a fair trial. The effective use of peremptory challenges has always been considered an essential, independent requirement in Anglo-Saxon jurisprudence.

Peremptory challenges were solidly established in early English law. Blackstone hailed the peremptory challenge as "a provision full of that tenderness and humanity to prisoners, for which our English laws are justly famous." 4 *Blackstone's Commentaries* 352 (1822). In *Swain v. Alabama,* 380 U.S. 202, 219, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965),[4] the Supreme Court noted that "the persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury." Although the Constitution does not require Congress to grant peremptory challenges, the Supreme Court has recognized that the challenge is " 'one of the most important of the rights secured to the accused.' " *Swain,* 380 U.S. at 219, 85 S.Ct. at 835, *citing, Pointer v. United States,* 151 U.S. 396, 408, 14 S.Ct. 410, 414, 38 L.Ed. 208 (1894). "[T]he denial or impairment of the right is reversible error without a showing of prejudice." *Swain,* 380 U.S. at 219, 85 S.Ct. at 835 (citations omitted); *see also United States v. Johnson,* 584 F.2d at 155.

In *Johnson,* Judge Celebrezze observed that "[w]here veniremen have been exposed to prejudicial publicity, the nature and degree of that exposure is certainly a matter of legitimate concern to a defense attorney . . . deciding on peremptory challenges." 584 F.2d at 155. Here, the trial judge completely frustrated the right to exercise peremptory challenges by preventing the defense from acquiring the information it needed to effectively utilize its peremptories. Under *Swain* and *Johnson,* the trial court committed reversible error.

There remains another serious prejudice not addressed by the en banc opinion. Both Governor Blanton and defendant Allen timely moved the court for a change of

---

3. *See* En banc Op. at 829, *ante.*

4. In *Swain v. Alabama,* 380 U.S. 202, 218, 85 S.Ct. 824, 834, 13 L.Ed.2d 759 (1965), the Supreme Court noted that peremptory challenges and challenges for cause have "fallen into disuse" in England. One explanation for this is the "greater control" which English courts exercise over pretrial publicity. *Swain,* 380 U.S. at 218 n. 24, 85 S.Ct. at 835 n. 24. I fully agree

with the majority's concern for the right of the press to report ongoing criminal investigation and trials, especially those involving affairs of public importance. However, concepts of fair trial and free press are not necessarily mutually exclusive. If a more sensitive *voir dire* is necessary to accommodate both interests, in my opinion, the effort is fully justified by the values implicated.

venue. The trial judge sensibly deferred ruling upon this motion until he was able to determine whether an impartial jury could be selected in Nashville. Once the jury was picked, the trial judge denied the motion to change venue, ostensibly because experience had shown that impartial jurors could be found in Nashville. The only difficulty in this procedure was that the method of *voir dire* effectively precluded both counsel and the trial judge from determining whether the jurors were in fact unbiased. The method also effectively deprived our court of any record by which that decision could be reviewed.

## V.

The en banc opinion and Judge Kennedy's concurrence seem to infer that the defendants' difficulties in obtaining adequate *voir dire* were of their own making. I respectfully disagree.

The defendants made known their objections to the proposed manner of *voir dire* early and often. Extensive written requests for *voir dire* relating to pretrial publicity were submitted by Blanton, Hood, and Allen. Relevant excerpts from those requests are appended hereto as Attachments A, B & C. The observation in the concurrence that the defendants did not ask for individualized *voir dire* before impanelling the first group of jurors, is in my opinion, inaccurate.

*Voir dire* commenced on April 20, 1981. On April 14, 1981, Blanton filed a "motion for Right of Counsel to Participate in *Voir Dire* Examination." That motion requested "that counsel be permitted to participate in the *voir dire* examination *outside the presence of other jurors.*" App. 235 (emphasis added). On April 20, 1981, Hood also "move[d] the court to *voir dire* each prospective juror individually." App. 615. Allen moved for individualized *voir dire* of those jurors who stated an opinion.[5]

The en banc opinion and the concurrence do not consider that a broader question

than *individualized voir dire* is at issue here. Counsel strenuously objected to the fact that *no questions* about media exposure were asked of the venire, before the first group of jurors was chosen. Counsel stated:

MR. WILLIS: Secondly, let me raise this question with the Court. And I think, for the record, I should move the Court orally at this time to ask the Defendant Hood's questions number 39 through 58 previously submitted to the Court, all of which deal with pretrial publicity, on the theory that the information that has been developed from the Jury at this point is inadequate to permit us to intelligently exercise a peremptory challenge.

MR. MCLELLAN, JR.: We would ask, Your Honor, that you ask the Jury—which you have done in general terms—but specifically, if their judgment has been affected by reading articles with the name Blanton in it, members of his family.

App. 1531. Even counsel for the Government requested a more comprehensive *voir dire* on the subject of publicity:

MS. ARTHUR: I was just going to say that we would join in Mr. Willis' motion as far as additional voir dire on publicity. Your Honor may or may not know about the publicity that took place at the very end of Mr. Blanton's term in office. And I think Mr. Willis pointed that out. We are not just talking about pretrial publicity involving the case. The Government would urge Your Honor to do some more voir dire on publicity.

App. 1531–32. Counsel continued to object to the procedure after the first group of jurors was chosen, stating:

MR. WILLIS: Your Honor, I don't want to wear my welcome out with Your Honor. But I feel compelled once again to raise the question of a more specific in-depth inquiry into what these jurors

---

**5.** *See* Motion Concerning *Voir Dire* or in the Alternative Change of Venue or Severance, docketed April 20, 1981.

have seen and read and heard. And in that context, I cite Your Honor the decision of the Sixth Circuit in the United States versus Dellinger, 472 Fed.2d 340, which Your Honor is probably already well familiar with. We believe that we need to have more of an inquiry than what reveals the basis for a challenge of cause. We believe that we need to have a sufficient in-depth inquiry so that we may intelligently exercise our peremptory challenges.

App. 1574. *See also* App. 1565. Defendants by no means waived their rights to challenge the adequacy of the *voir dire.*

## VI.

In stating that the Supreme Court has not established a *per se* rule regarding jury *voir dire,* the en banc opinion implies that the original panel has done so. I respectfully suggest that a careful reader of Judge Gibson's opinion will search in vain for any expression of a *per se* rule. In fact, Judge Gibson emphasized the trial judge's broad discretion. *See* 700 F.2d at 303, 309.

The panel opinion contains no invariable mandate to compel either private or individualized interrogation of jurors or to adopt the "ABA standards," however salutary they may be.[6] Neither does the panel opinion compel the trial judge to yield the *voir dire,* or any part of it, to the trial attorneys.

There are probably as many ways of handling *voir dire* as there are judges and trial attorneys. The original panel did not attempt to legislate any one rule and I, for one, would not attempt to, given the chance. Local practices vary with local history and mores. Beyond that, individual circumstances vary with the particular judge and attorneys involved. It is true, on one hand, that trial counsel may be best able to probe and uncover hidden motives which may affect the objectivity of a juror. On the other hand, there always remains the very real risk that the conduct of *voir dire* by counsel, especially in a highly publicized trial, may lead more to harassment than to enlightenment. Most observers would, I believe, admit that in such a trial the judge must exercise particularly close control to avoid potential abuse. The panel opinion never sought to spell out exactly how the trial judge must exercise that control, however:

[W]e agree with the implication in *Johnson* that the voir dire should provide some surface information so the parties can use their peremptory challenges in an intelligent or purposeful manner.

In the instant case, where there was substantial, even massive pretrial publicity, the voir dire should have been extensive enough to allow defendants to learn which veniremen were most exposed to publicity, from what sources that exposure came, and who held opinions. That information would have helped defendants detect suspected biases and use their peremptory challenges accordingly, helping to insure an impartial jury. The defendants had no information which would cause them to suspect biases which either were not strong enough for disqualification for cause or were not evident enough for the court to believe disqualification was in order. The lack of such information was an impairment of the peremptory challenge right, and would of itself require reversal.

6. The Standard provides:

The following standards govern the selection of a jury in those criminal cases in which questions of possible prejudice are raised.

(a) If there is a substantial possibility that individual jurors will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to exposure shall take place outside the presence of other chosen and prospective jurors. An accurate record of this examination shall be kept by court reporter or tape recording whenever possible. The questioning shall be conducted for the purpose of determining what the prospective juror has read and heard about the case and how any exposure has affected that person's attitude toward the trial, not to convince the prospective juror that an inability to cast aside any preconceptions would be a dereliction of duty.

*ABA Standards for a Fair Trial and Free Press,* section 3.5 (final draft 1974).

We are not unmindful of the trial court's finding that the "jury selected is as fair and impartial a jury as could be obtained" and that a trial judge must be accorded considerable latitude and allowed a range of flexibility in impaneling a petit jury. Also we note that an appellate court will not interfere with the jury selection process absent an abuse of discretion. *[U.S. v.] Blount,* 479 F.2d [650] at 651; *United States v. Owens,* 415 F.2d 1308, 1315 (6th Cir.1969), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 406 (1970); *Silverthorne [v. U.S.],* 400 F.2d [627] at 638. Although the trial court's finding might be correct, there is no way on this record to probe that finding since the record is silent on the extent of the veniremen's exposure to the pretrial publicity and the depth and extent of their personal reactions to the massive publicity. We conclude as a matter of fairness that the court should have probed into the effect of the publicity upon the prospective jurors, both for challenges for cause and for the exercise of peremptory challenges.

700 F.2d at 309–10. In sum, Judge Gibson's opinion left available to the trial court on remand the widest possible range of choices consistent with its responsibility to insure the defendants a fair and impartial jury.

The en banc opinion rightly observes that it is a "major problem" to choose a jury without exposing or reexposing potential jurors to prejudicial information. The opinion indicates, however, that the solution to the problem is "deliberately to avoid" such exposure. En banc opinion at 820–821, *ante.* As a practical matter, the opinion implies that the only solution is to avoid the issue altogether, perhaps in hope that the problem will go away. Alternatively, it assumes that a trial judge is powerless to protect the defendant from prejudicial publicity where the judge "comes on the scene *after* the media exposure." *Id.* (emphasis in original).

There are alternatives to the excessive and unnecessary limitations imposed upon the *voir dire* below. Trial judges in their discretion have used several *voir dire* methods to protect the rights of highly publicized defendants such as Governor Blanton. The most obvious method is individualized *voir dire* outside the presence of other jurors, as advised by section 3.5 the ABA Standards. *See* note 6, *supra.* This method was used in the trial of Watergate defendants H.R. Haldeman, John Erlichman and John Mitchell. *United States v. Haldeman,* 559 F.2d 31 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Following general questioning of the veniremen in groups, the trial judge there questioned each juror individually.

Before the publicity was mentioned the venireman was asked if he believed that any defendant was probably guilty. He was then asked if he had heard of the case and, if so, whether anything he had heard or read about the case stood out in his mind. The next questions asked whether the venireman had seen the defendants or their lawyers in the newspapers or on television and whether he remembered anything in particular about them. Subsequently the court determined which newspapers and magazines the venireman read and with what degree of regularity; which television news programs he watched; whether he had followed the legislative inquiries related to Watergate or read any of the books or other lengthy pieces concerning Watergate, including the presidential tape transcripts; whether he had followed Watergate closely or casually; and whether (and how recently) he had discussed the case.

After determining the venireman's degree of interest in and exposure to the case, the court inquired whether he had formed or expressed an opinion of the guilt or innocence of any defendant.

559 F.2d at 65–66.

The trial judge used a similar method in the trial of Lieutenant William Calley on murder charges following the "My Lai massacre." The Fifth Circuit described the questioning:

The second reason to credit the court members' statements is that they were the product of searching and sensitivity conducted voir dire. The military judge conducted the voir dire in accordance with the recommendations of the American Bar Association Project on Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press 3.4(a) (Approved Draft, 1968). The examination of each court member was held out of the presence of other prospective jurors. Judge Kennedy, the military judge, himself inquired into the prospective court members' exposure to publicity and ability to render a fair and impartial verdict. But more importantly, both defense counsel and the prosecution were allowed almost unlimited freedom to inquire into the court members' attitudes, perceptions, backgrounds and the nature and extent of their exposure to pretrial publicity. *Calley v. Callaway,* 519 F.2d 184, 208–09 (5th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). *See also United States v. Ehrlichman,* 546 F.2d 910 (D.C.Cir.), *cert. denied,* 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977) (burglary of psychiatrist's files regarding Daniel Ellsberg, who released the "Pentagon Papers"); *People v. Manson,* 61 Cal.App.3d 102, 132 Cal.Rptr. 265 (1976), *cert. denied,* 430 U.S. 986, 97 S.Ct. 1686, 52 L.Ed.2d 382 (1977) ("Manson family" Tate and LaBianca murder trial); *People v. Collins,* 43 Mich.App. 259, 204 N.W.2d 290 (1973), *lv. to appeal denied,* 391 Mich. 798, *cert. denied,* 419 U.S. 866, 95 S.Ct. 121, 42 L.Ed.2d 103 (1974) (John Norman Collins convicted of one of several "Ann Arbor" murders).

Most observers would agree that use of ABA Standards would more likely produce error-free trials. I sense in my colleagues, however, a countervailing fear that at best the panel opinion would both hog-tie the trial judge and unduly protract the jury selection process and subject the jurors to embarrassment and harassment.

It is for just such reasons that Rule 24 grants the district courts such wide latitude in these matters. It leaves to their sound discretion the duty to forge a reasonable accommodation between the interests in obtaining an unbiased jury, and in doing so as expeditiously as possible. *United States v. Dansker,* 537 F.2d 40, 56 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

In striking a balance between these competing concerns, trial judges have used several methods of *voir dire.* There is no mandate to interrogate each potential juror privately. For example, when Gordon Liddy was tried for his role in the Watergate incident, the D.C. Circuit accepted a *voir dire* procedure whereby the judge asked general questions of the entire jury and individually questioned only those who had an opinion about the case, or who recalled details of the case. Only the eight jurors who acknowledged they were exposed to publicity were individually questioned. *United States v. Liddy,* 509 F.2d 428, 436–37 (D.C.Cir.1974), *cert. denied,* 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975).[7] *Accord, United States v. Bryant,* 471 F.2d 1040 (D.C.Cir.1972), *cert. denied,* 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973); *United States v. Mazzei,* 390 F.Supp. 1098 (W.D. Pa.), *mod. on other grounds,* 521 F.2d 639 (3d Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975).

*United States v. Addonizio,* 451 F.2d 49 (3d Cir.1972), *cert. denied sub nom. Biancone v. United States,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972), illustrates that a judge in his discretion may conceive of several means of questioning the jury that protect the rights of the defendant while serving the interests of efficiency. In *Addonizio,* several city officials were prosecuted for their roles in a "kickback" scheme on city projects. The trial judge did not conduct individualized *voir dire.*

The voir dire examination of prospective jurors was conducted exclusively by the trial judge. Counsel were not per-

---

**7.** Although the court found that such *voir dire* is consistent with the ABA Standard, it is not.

The ABA Standard requires individualized *voir dire* of all potential jurors. *See note 6, supra.*

mitted to participate, although they submitted proposed questions, many of which were asked by the court. The preponderance of the voir dire was devoted to determining the extent of each prospective juror's exposure to pretrial publicity and the effect of that exposure upon his ability to judge the defendants impartiality. Invariably, any prospective juror who indicated he knew something about the case was questioned further as to the nature and extent of his exposure, while at the same time being admonished not to go into the *substance* of what he had read. Typically the inquiry centered around the particular newspapers in which the prospective juror had seen case-related stories and whether he had read entire articles or only portions thereof (or, in some instances, merely headlines). Prospective jurors were then questioned at some length as to whether they had formed any opinion as to the guilt or innocence of the defendants and whether they could judge the defendants impartially despite some exposure to pretrial publicity.

\* \* \* \* \* \*

Prospective jurors who had formed an opinion as to guilt or innocence of any of the defendants were excused *sua sponte* by the court. Prospective jurors who had discussed the case were similarly excused, regardless of the nature or extent of the discussion or their own expression of impartiality. The court dismissed on its own motion each prospective juror who indicated extensive exposure to pretrial publicity, *without regard* to protestations of impartiality.

451 F.2d at 65–67 (emphasis in original).

Another alternative was available here. Blanton submitted a written questionnaire

to be completed by the potential jurors. This process could serve as an effective way to screen jurors and to determine which should be questioned further without asking any questions before the entire venire.

In conclusion, there are many alternatives. Judge Gibson's opinion does not embrace a *per se* rule.

## CONCLUSION

The en banc opinion makes the following observations concerning these defendants:

> Governor Blanton ran for and was elected to the highest office in Tennessee state government. This fact guaranteed that for the term of office to which he was elected, he would be constantly in the limelight and every act and word would be subject to comment. The other two defendants accepted positions in state government in close proximity to its head. Under the First Amendment, neither the defendants nor any court in the United States could (or should) have prevented the public media comment which ensued.

En banc op. at 820.[8]

The issue here is not whether a famous or notorious person is entitled to a greater measure of deference due to his exalted station in life; he is not. However, a greater degree of care may nonetheless be necessary to assure the same fairness that is ordinarily enjoyed by any private citizen.

I respectfully suggest that my colleagues in the majority may not fully appreciate the impact which their opinion is bound to have upon the jury selection process. In a very real sense, the majority has reverted to a system of which Blackstone reports the English had become "heartily tired" by the time of Queen Anne. 3 *Blackstone's Commentaries* 360 (1822).[9] Jurists from Chief

---

**8.** See note 4, *supra*, for comment on First Amendment values.

**9.** Blackstone reports that under "ancient law, the jury was to come *de vicineto,* from the neighbourhood of the vill or place where the cause of action was laid in the declaration." 3 *Blackstone's Commentaries* 359 (1822). The rationale for this selection system was that jurors from the parties' neighborhood would "know beforehand the characters of the parties and witnesses, and therefore they better knew what credit to give to the facts alleged in evidence." *Id.* Even in Blackstone's time, however, it was apparent that jurors with prior knowledge of the parties often could not set aside their prejudices:

Justice John Marshall, to District Judge John J. Sirica, who have struggled with the problem of pretrial publicity would be surprised to learn that the law no longer requires courts to pursue the often tedious task of determining which prospective jurors may entertain "light impressions which may be fairly supposed to yield to the testimony that may be offered," and which jurors entertain "those strong and deep impressions which will close the mind against the testimony which may be offered in opposition to them, which will combat the testimony, and resist its force . . . ." *United States v. Burr*, 25 Fed.Cas. 49, 50 (No. 14,692g) (C.C.Va.1807). Now, even in the most notorious cases, the parties and the court alike will be left to assess juror bias solely upon the basis of silence in the face of general questions, generally put, entirely without regard to the source or nature of the pretrial publicity or to the extent of individual exposure or reaction to it. Such a procedure no doubt will speed up trials, as it did here. The price, however, in terms of traditional American notions of fairness, is too high.

## ATTACHMENT A

Defendant Blanton's requested *voir dire* questionaire contained the following inquiries relating to pretrial publicity:

40a. Do you read The Nashville Tennessean? ( ) Yes ( ) No

40b. Do you subscribe? ( ) Yes ( ) No ( ) Sunday subscription only

40c. How often do you read it? ( ) Once a week ( ) 2-3 times a week ( ) 4 or more times a week ( ) Every day ( ) Only when something special is reported ( ) Sunday only

41a. Do you read The Nashville Banner? ( ) Yes ( ) No

41b. Do you subscribe? ( ) Yes ( ) No ( ) Sunday subscription only

41c. How often do you read it? ( ) Once a week ( ) 2-3 times a week ( ) 4 or more times a week ( ) Every day ( ) Only when something special is reported ( ) Sunday only

42. What other Local/State Newspapers do you read?
.........................................................

43. What Out-of-Town Newspapers do you read? .......
.........................................................

44. What are your 3 favorite General TV Programs?
1. ..............................................
2. ..............................................
3. ..............................................

45a. What TV News Programs do you watch? ...........
.........................................................

45b. How many times a week do you watch TV News?
.........................................................

46. What is your favorite Radio Station? ..............

47. Please list what Magazines and Periodicals you read:
.........................................................
.........................................................

* * *

67. Have you heard the name Blanton? ( ) Yes ( ) No

68. Have you heard the name Blanton in connection with State Government?
( ) Yes ( ) No

69. Have you read anything in the newspapers or heard anything on the radio or television about Ray Blanton?
( ) Yes ( ) No

70. Was what you heard: Good ( ) Bad ( )

71. Do you feel that Ray Blanton is Corrupt?
( ) Yes ( ) No

72. Since Ray Blanton has been accused of a crime, do you believe that he is guilty?
( ) Yes ( ) No

73. Has the publicity which Ray Blanton has received and the resulting public notoriety affected your opinion of Governor Ray Blanton?
( ) Yes ( ) No

74. Can you separate Governor Ray Blanton from his co-defendants Mr. Hood and Mr. Allen or from other people about whom you may have read who were employed by Governor Blanton during his administration?
( ) Yes ( ) No

App. 241–42, 243. None of the above questions was asked.

But this convenience [*i.e.*, prior knowledge] was overbalanced by another very natural and almost unavoidable inconvenience; that jurors, coming out of the immediate neighbourhood, would be apt to intermix their prejudices and partialities in the trial of right. And this our law was so sensible of, that it for a long time has been gradually relinquishing the practice.

*Id.* at 359–60. In the reign of George II, the *de vicineto* system was completely abolished, in favor of the *de corpore comitatus* system, by which jurors were selected "from the body of the county at large." *Id.* Thus, we have come almost full circle from a system preferring jurors with prior knowledge, to a system seeking to exclude such persons, to the present system under which the defense is barred from determining whether prospective jurors have prior knowledge or not.

## ATTACHMENT B

Defendant Hood submitted the following proposed questions for *voir dire* concerning pretrial publicity:

40. Have you talked with anyone who claimed to know any of the facts supposedly involved in this case?

41. Do you regularly read *The Tennessean?*

42. Do you regularly read *The Nashville Banner?*

43. Do you regularly read *The Columbia Herald?*

44. Do you regularly read *The Clarksville Leaf Chronicle?*

45. Do you regularly watch the daily news on Nashville television stations?

46. Which station do you watch with the greatest frequency?

47. Do you regularly listen to radio newscasts?

48. Have you read any newspaper articles that referred to Clyde Edward Hood, Jr.?

49. In what newspaper did you read these articles?

50. Did these articles purport to give facts that you now believe to be related to the matter currently going to trial?

51. Do you remember any of the details of these articles?

52. Have you seen any television newscasts that referred to Clyde Edward Hood, Jr.?

53. Did these newscasts purport to give details that you now believe to be related to the matter currently going to trial?

54. Do you now remember what those details were?

55. Have you heard any radio newscasts that referred to Clyde Edward Hood, Jr.?

56. Did these newscasts purport to give details that you now believe to be

related to the matter currently going to trial?

App. 641–42. None of the above questions was asked.

## ATTACHMENT C

Defendant Allen submitted the following proposed questions for *voir dire* concerning pretrial publicity:

14. Have you received any knowledge or information about the case by way of the newspapers, radio, television, talking with acquaintances, or otherwise?

15. Have you received any knowledge or information about any other criminal case involving State officials, employees, or members of the family of any defendant, by way of newspapers, radio, television, talking with acquaintances, or otherwise?

Neither of the above questions was asked.

KEITH, Circuit Judge, dissenting.

I am delighted to join in Judge Engel's excellent, thorough and comprehensive opinion. I am, however, compelled to write separately, because as a member of the original panel in this case, I am totally convinced that we were correct in reaching the conclusion that the defendants were denied a fair and impartial trial, as guaranteed them by the Sixth Amendment of the United States Constitution. This denial, in my judgment, was based on the inadequate *voir dire* examination.

This case is a direct appeal from a federal criminal trial. We have a duty as an appellate court to exercise supervisory authority over the conduct of such trials. If this case involved *habeas corpus* review of a state court conviction, we could only overturn the conviction if the error rose to the level of constitutional dimensions. However, in this case, our scope of review is not so limited. It is broad, it should be broad. We have an obligation and indeed a duty to ensure that federal criminal trials are fairly conducted. Judge Gibson's [1] superb opinion for the panel was faithful to this duty.

1. Judge Gibson was formerly a U.S. District Judge and also Chief Judge of the Eighth Circuit.

Words fail to do justice to the amount of publicity this case has received—pre- and post-judgment. At issue in this case is the alleged conduct of a former governor, the governor's campaign manager and a former special assistant to the governor. A federal indictment of a former governor is by itself an extraordinarily newsworthy item. This is particularly true because the alleged federal criminal violations occurred during the governorship. Moreover, defendant Leonard Ray Blanton was no ordinary governor. His successor, Governor Lamar Alexander, was sworn in several days ahead of schedule, allegedly to prevent Governor Blanton from pardoning or commuting the sentences of numerous state prisoners. The alleged corruption of the Blanton administration has been and will be the subject of books, articles and historical research, and perhaps a movie.

We have no control over the verdict of public opinion or the verdict of history. This case, however, concerns something that is more important and fundamental—a man's liberty and his right to a fair trial. Under our system of justice, everyone, including an allegedly corrupt ex-governor, is entitled to a fair trial before a fair and impartial jury of his peers—no more and no less. The record in this case as to *voir dire*, contains none of the assurances which would guarantee that the jury was fair and impartial. The trial judge did not ask the prospective jury panel what they had heard about the case, the defendants or the source of such information. The judge did not ask the venireman whether they had formed an opinion about the case nor did he probe the nature and extent of that opinion. The trial judge simply asked the prospective jurors whether they could put aside any opinion or prejudice they may have, and decide the case on the evidence before them. This was woefully inadequate considering that the case concerned: (1) an allegedly notorious former governor; (2) a trial which was located in the state capital and the subject of massive media coverage; and (3) alleged offenses that occurred while the ex-governor was in office.

In my experience, many jurors, consciously or subconsciously, tend to believe that a defendant, if indicted, is guilty. After all, they say, the government would not bother investing the time, energy and effort to investigate and indict a person unless there was good reason to believe that person was guilty. In the ordinary case, this belief is corrected by argument of the attorneys and instructions from the judge. A man is presumed innocent in our society, under our laws, until he is proven guilty beyond a reasonable doubt. In a case such as this, however, there has been a drum beat of intensive publicity for two years prior to trial. Indeed, the publicity continues. These extraordinary circumstances, at a minimum, required careful, even individual questioning of prospective jurors. No literate resident in Nashville, or for that matter, in the entire State of Tennessee, could fail to have at least an impression about former Governor Blanton. Therefore, only the most careful, indeed, individual questioning could ensure the selection of an impartial jury.

In the federal system, a trial judge has broad authority over *voir dire*. A federal trial judge can either conduct *voir dire* himself, or allow the attorneys to question the jurors, or in the alternative they can both share the conducting of the *voir dire*. In practice, most federal trial judges conduct *voir dire* themselves. It is rare that attorneys are permitted to question the jurors. This is in contrast to some state systems where attorneys routinely conduct the *voir dire* of the jury.

In this case, the trial judge followed the federal custom—he conducted the *voir dire* entirely himself. The Judge exercised his discretion and did not permit the attorneys to question the jury panel. Because the trial judge assumed the duty of conducting *voir dire*, it was particularly important that he carefully probe any possible source of bias. It is distressing that a majority of the *en banc* court has approved the bare-bones questions that occurred in this highly publicized case.

I find particularly distressing the majority's statement concerning publicity. This statement intimates that the defendants created some of the publicity by running for public office or associating with a man in high public office. The majority suggests that the defendants deserved what they got, or that this in some way, justified the inadequate *voir dire*. Such a suggestion is indeed, incredible. Does the majority actually believe that a man stands before the bar of justice in a lesser light because he was an elected public official? The reason why a case is highly publicized should be irrelevant. What matters are the steps taken to ensure a defendant has a fair trial—regardless of the source of reasons for publicity. Whether a man ran for high public office should have no effect on his basic constitutional rights or on this Court's review of his conviction.

I am, frankly, at a loss to explain why the *en banc* court has approved this *voir dire*. There are no cases on point which approve questioning so limited as what was permitted in this case. The majority opinion establishes an unwise and dangerous precedent which tampers with basic rights. More importantly, we have no way of knowing, based on the record of the *voir dire* in this case whether the defendant's convictions may well have been influenced and procured not by what took place at trial or during the course of the trial, but by outside influences. We should not tolerate such a shotgun and cavalier result. The defendants are entitled to a new trial. I respectfully dissent from the majority's insistence on not giving them that new trial.